UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ROXANNE PURCELL *ex rel* ESTATE OF
GARLAND TYREE JR.,

                                                        **MEMORANDUM & ORDER**

                              Plaintiff,                18-CV-3979 (PKC) (TAM)

              - against -

CITY OF NEW YORK; SERGEANT
ANTHONY LISI; DETECTIVE SHAWN
MCLAUGHLIN; DETECTIVE ROBERT
REED; DETECTIVE MATTHEW
GRANAHAN; DETECTIVE ROBERT
SCHIERENBECK; DETECTIVE NOAH
MOLINA; and DETECTIVE RICHARD
COLANGELO,[1]

                              Defendants.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

        Roxanne Purcell brings this *pro se* action on behalf of the estate of her son, Garland Tyree

Jr. ("Tyree"), alleging excessive force and other violations of the United States Constitution by

officers of the New York City Police Department ("NYPD") (hereafter "Defendants") and the City

of New York (the "City") in connection with Tyree's death on August 14, 2015.  (Second Amended

Complaint[2] ("SAC"), Dkt. 58-1, at ECF[3] 4–9.)  Currently pending before the Court is Defendants'

---

[1] The Court notes that the "Bureau of Alcohol, Tobacco, Firearm Explosive" is listed on the docket in this case, but was not named in the Second Amended Complaint and is not a party in this case.  (Dkt. 58-1.)  The Clerk of Court is therefore respectfully directed to amend the docket accordingly.

[2] The Court previously found that the operative complaint in this matter is the Second Amended Complaint (Dkt. 58-1) submitted by Plaintiff on October 24, 2019.  (*See* 5/19/2020 Mem. & Order, Dkt. 74, at 1 n. 1.)

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

motion for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56, brought by all Defendants.  For the reasons stated below, Defendants' motion is granted, and this case is dismissed.

## BACKGROUND

### I.    PROCEDURAL HISTORY

The Court described the complicated procedural history of this case and the prior two civil rights lawsuits that Plaintiff filed on behalf of her son in its May 19, 2020 Order granting in part and denying in part Defendants' motion to dismiss, and therefore presumes the Parties' familiarity with the procedural history of this matter.  (*See* Dkt. 74, 5/19/2020 Mem. & Order, at 1–6.)  In that decision, the Court found that Plaintiff has standing to assert claims against the NYPD Defendants, but dismissed the newly asserted claims against Defendants Dennis Cavalli, Nicola Zuill, and Florlana Persechino of the Office of the Chief Medical Examiner ("OCME"), as well as all claims brought by Plaintiff on behalf of her grandson, Tyree's son.  (*Id.* at 8–15.)[4]

On June 2, 2020, Defendants filed their Answer to Plaintiff's Second Amended Complaint. (Dkt. 75.)  Plaintiff moved for an extension of time to complete discovery, and for the U.S. Marshals to serve subpoenas on third parties on Plaintiff's behalf.  (Dkt. 77.)  The Honorable Magistrate Judge Roanne L. Mann granted the first request, extending the discovery deadline to November 12, 2020, but denied the latter request on grounds that Plaintiff's *in forma pauperis*

---

[4] Plaintiff's Second Amended Complaint alleged the following claims:

The Fourth, Fifth, Sixth, Eight [sic] and Fourteenth Amendment[s]; Restricts the Government from Authorizing unreasonable search and seizures [sic]. Cruel and unusual punishment.  Excessive and Deadly Forces.  Deprive any person of Life, Liberty, or property without due process of law and 18 U.S.C. 1519 Destruction, alteration or falsification of Government Evidence.

(SAC, at ECF 5, 7.)

status does not entitle her to service of discovery subpoenas by the Marshals.  (Dkt. 78.)  Plaintiff then moved for reconsideration of Judge Mann's Order, Defendants responded, and the Court affirmed Judge Mann's Order.  (Dkts. 79–81.)  The Court also noticed that Defendant Lt. James Hayes of the Fire Department of New York ("FDNY") had not yet been served, and ordered the City to ascertain a current address at which he could be served.  (Dkt. 81.)  The Office of Corporation Counsel of the City of New York ("Corporation Counsel") advised the Court that it was authorized to receive service on Lt. Hayes's behalf, and thereafter waived service.  (Dkts. 83, 87, 89.)

The Parties jointly moved twice more to extend discovery, and Judge Mann granted both requests, such that discovery was scheduled to close on April 29, 2021.  (Dkts. 86, 102; 4/29/2021 Docket Order.)  Plaintiff also filed a motion to compel discovery (Dkt. 85), which Defendants opposed (Dkt. 88.  Judge Mann ordered the Parties to confer regarding a mechanism for Plaintiff to depose Lt. Hayes, and ordered Defendants to produce additional discovery materials.  (Dkt. 90.)  On January 14, 2021, Defendants filed a letter motion for a pre-motion conference regarding an anticipated motion to dismiss the claims against FDNY Lt. Hayes.  (Dkt. 94.)  The Court converted that letter into a motion to dismiss, and ordered oral argument on the motion, which was held on February 4, 2021.  (1/18/2021 Docket Order; 2/4/2021 Minute Entry.)  Lt. Hayes was dismissed from the case on consent of Plaintiff thereafter, leaving only the claims against the instant Defendants ("NYPD Defendants").  (2/4/2021 Minute Entry.)

On July 14, 2021, Corporation Counsel, on behalf of the NYPD Defendants, filed a motion for a pre-motion conference regarding an anticipated motion for summary judgment.  (Dkt. 113.)  The Court granted the motion and scheduled the conference for August 25, 2021, then granted Defendants' motion to adjourn the conference to October 1, 2021.  (*See* Dkt. 114; 7/16/2021

Docket Order; 7/30/2021 Docket Order.)   Plaintiff then filed a pre-motion conference request regarding her own anticipated motion for summary judgment, which the Court acknowledged and said it would address at the October 1 conference.  (Dkt. 115; 8/10/2021 Docket Order.)  At the conference, a briefing schedule was set for Defendants' summary judgment motion, to be completed by March 2, 2022.[5]  (10/1/2021 Minute Entry.)  The Court also "informed the [P]arties that the Court would attempt to obtain Plaintiff's son's full probation files, review them, and, at the Court's discretion, release any relevant information to the [P]arties."  (11/10/2021 Docket Order.)

Plaintiff thereafter filed a series of letters seeking the Court's assistance in obtaining discovery materials.  (Dkts. 118, 119, 121.)  Defendants opposed the first of these, filed on October 21, 2021, on grounds that discovery had closed on June 14, 2021 without Defendants seeking any of the requested documents, and because Defendants had already produced all relevant and non-privileged discovery "including over 3,100 pages of documents and recordings."  (Dkt. 120, at ECF 1.)

By docket order dated November 10, 2021, the Court acknowledged receipt of Plaintiff's first and second letters, in which Plaintiff requested the Court's help to obtain her son's "full Probation Department files as well as a polygraph test about a conversation Plaintiff had with her son[.]"  The Court referred Plaintiff back to the plan the Court had articulated at the October 1, 2021 conference, reiterating that once the Court "completes its review of [Tyree's probation] files, it [would] issue a separate order outlining the results of that review."  (11/10/2021 Dkt. Order.)

---

[5] Plaintiff clarified at the pre-motion conference that she intended to respond to Defendants' motion for summary judgment, rather than to move for summary judgment herself.

The Court further denied Plaintiff's additional requests for "fourteen (14) broad categories of discovery" as untimely.  (*Id.*)

On November 19, 2021, Defendants moved for an extension of time to serve their motion for summary judgment on grounds that defense counsel was obtaining declarations from each Defendant and several others on behalf of both parties because Plaintiff, proceeding *pro se*, had been unable to depose Defendants.[6]  (Dkt. 122.)  The Court granted the extension over Plaintiff's objection (Dkt. 123), and set a revised summary judgment briefing schedule, to be completed by April 4, 2022.  (11/22/2021 Docket Order.)  That schedule was amended the following day to require Plaintiff to respond by March 7, 2022, and imposing a May 9, 2022 deadline for any reply by Defendants.  (11/23/2021 Docket Order.)

On December 3, 2021, the Court addressed Plaintiff's request that she submit to a polygraph examination regarding two conversations she had with her son's probation officer, Robert W. Anton.  (12/3/2021 Docket Order.)  The Court advised Plaintiff that there was no need for her to submit to a polygraph examination regarding either alleged conversation because she could instead submit a sworn declaration attesting to any information about which she has personal knowledge.  (*Id.*)  Additionally, the Court informed Plaintiff that it had completed its review of her son's Probation Department files, and would hold a telephone conference with the Parties to discuss its review on December 13, 2021.  (*Id.*)  At the December 13 conference, the Court informed the Parties that it "found no evidence of an improper motive for the attempt to arrest Mr. Tyree on August 14, 2015, which ultimately led to his death, and therefore was declining to release the files to either party."  (12/13/2021 Minute Entry.)  The Court further informed the Parties of

---

[6] Defendants also cited being "inundated" with tasks arising from other pending litigation, and pre-existing holiday travel plans.  (Dkt. 122, at ECF 1.)

its finding that "the Probation Department files were ultimately irrelevant to . . . the alleged use of excessive force by the police officers who executed the warrant and killed Mr. Tyree[.]"  (*Id.*)[7]

Defendants' motion for summary judgment was timely filed on January 7, 2022.  (Dkt. 124.)  On January 27, 2022, Plaintiff requested: 1) transcripts of all phone conferences between the Court and the Parties; 2) confirmation that the Honorable Judge Raymond Dearie's signature was on her son's arrest warrant; and 3) production of her son's 2012 and 2013 arrest warrants. (Dkt. 125.)  The Court denied all of Plaintiff's requests—the first because transcripts of court proceedings must be ordered from court reporters and cannot be provided by the Court, and the latter two because they were untimely discovery requests.  (1/28/2022 Docket Order.)

On February 16, 2022, Plaintiff moved for an extension of time to file her response to Defendants' summary judgment motion (Dkt. 126), which the Court granted, setting a revised April 7, 2022 deadline for Plaintiff's response and a June 9, 2022 deadline for Defendants' reply. (2/17/2022 Docket Order.)  On April 7, 2022, Plaintiff notified the Court that she had served her opposition on Defendants that day.  (Dkt. 131.)

The instant motion for summary judgment was fully briefed on June 9, 2022.  (Dkts. 130, 133–46.)  In opposition to Defendants' motion for summary judgment, Plaintiff filed only a 56.1 counter-statement.  (Pl.'s 56.1 Counter-Statement of Facts ("Pl.'s 56.1"), Dkt. 130.)

---

[7] The Court notes that at the December 13, 2021 status conference, the Court erroneously identified the excessive force claim as the only claim remaining in the case.  (*Id.*)  However, as discussed *infra*, Plaintiffs' other constitutional claims were addressed by Defendants in their summary judgment motion and are addressed in this Memorandum & Order.

## II.     RELEVANT FACTS[8]

On August 6, 2015, the Honorable Raymond J. Dearie issued a warrant for the arrest of

Garland Tyree for violating the conditions of his federal supervised release.  (Defs.' 56.1, ¶ 16;

"Arrest Warrant," Ex. M.)  Early in the morning on August 14, 2015, members of the NYPD

Regional Fugitive Task Force ("Task Force") went to Tyree's residence, a basement apartment at

15 Destiny Court, Staten Island, New York, to apprehend him.  (Defs.' 56.1, ¶¶ 17, 28.)  Upon

arriving at the residence, Task Force members descended the stairs to the door of Tyree's

apartment, knocked on his door, and told him to come out.  (Defs.' 56.1 ¶¶ 30–32.)  Tyree called

Plaintiff, his mother, while Task Force officers were at his door, causing Plaintiff to activate a

camera that was installed inside Tyree's apartment.  (Pl.'s 56.1, ¶¶ 79–80; Plaintiff's Sworn

Affidavit ("Pl.'s Aff."), Dkt. 132, at ECF 21, ¶¶ 69, 71; Plaintiff's 50-h Hr'g Test, ("50-h

Hearing"), Ex. B, Dkt. 134-2, at ECF 27–28.)  Task Force officers saw that there was someone

inside of the basement apartment who would not open the door, so they prepared to force open the

door.  (Defs.' 56.1 ¶¶ 33–35.)  However, as the Task Force officers prepared to force the door

open, a resident of the upper floors of the house provided the Task Force with keys to the basement.

---

[8] Unless otherwise noted, a standalone citation to Defendants' 56.1 Statement or *pro se* Plaintiff's factual submission denotes that this Court has deemed the underlying factual allegation undisputed.  Any citations to Defendants' 56.1 Statements or Plaintiff's submission incorporate by reference the documents cited therein, if any.  Where relevant, however, the Court may cite directly to the underlying document.  The Court has deemed facts averred in a party's 56.1 statement or factual submission to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."  (emphasis in original)).  Additionally, to the extent that a party's 56.1 statement or factual submission "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party], without specifically controverting those facts[,]" the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

(Defs.' 56.1 ¶¶ 36–37; Decl. of Detective Miguel Nunez ("Nunez Decl."), Ex. O, ¶ 11–12; Landlord Interview, Dkt. 132, at ECF 11.)

Task Force officers used the key to unlock Tyree's door, knocked again, identified themselves as police, and commanded Tyree to open the door, or else the officers would enter themselves. (Defs.' 56.1, ¶¶ 38–39.) Hearing no response, Detective Nunez opened the door partway and turned on the lights with a switch that was near the door. (Defs.' 56.1, ¶¶ 40–43.) The Task Force members observed a large amount of smoke emanating from the apartment, and, believing that someone may have set fire to the basement apartment, called for assistance from additional police units and the FDNY.[9] (Defs.' 56.1, ¶¶ 45–47, 52.) FDNY firefighters arrived soon thereafter. (Defs.' 56.1, ¶ 53; Nunez Decl., Ex. O, at ¶ 25.) FDNY Lt. James Hayes was informed that officers were unsure if the individual inside the residence was armed. (Lt. Hayes Dep. ("Hayes Dep."), Ex. P., Dkt. 134-16, at 6.) Lt. Hayes went to the entrance of the basement apartment, identified himself, and, seeing the billowing smoke, commanded Tyree to come out, warning Tyree that he would otherwise succumb to carbon monoxide poisoning. (Defs.' 56.1, ¶¶ 54–56.) Hearing no response, and believing that whoever was inside had succumbed to the smoke, Lt. Hayes entered the apartment. While inside, he heard multiple gunshots and was struck by bullets shot from inside the apartment. (Defs.' 56.1, ¶¶ 57–60.) Lt. Hayes was carried up the stairs and away from the apartment by Task Force officers. (Defs.' 56.1, ¶ 64; Nunez Decl, Ex. O, at ¶ 34.) Several minutes later, Task Force officers heard more loud bangs that they believed to be gunshots coming from the apartment. (Defs.' 56.1, ¶ 65; Nunez Decl., Ex. O, at ¶ 35.)

---

[9] The smoke was later determined to have been coming from a smoke grenade. (Defs.' 56.1 ¶ 48; Ex. CC.)

Soon after Lt. Hayes was shot, members of the NYPD Emergency Services Unit ("ESU"), including Defendants Sergeant Anthony Lisi and Detective Richard Colangelo, arrived.  (Defs.' 56.1, ¶ 66–67; Nunez Decl., Ex. O, at ¶ 36.)  ESU officers were told by Task Force officers that they believed that Tyree was residing in the basement apartment, may have set fire to the apartment, and had shot Lt. Hayes.  (Defs.' 56.1, ¶¶ 67–70, 77; Decl. of Sergeant Lisi ("Lisi Decl."), Ex. Q, Dkt. 134-17, at ¶¶ 14–16; Decl. of Detective Colangelo ("Colangelo Decl."), Ex. R, Dkt. 134-18, at ¶¶ 10–12.)  The ESU officers told the Task Force officers to clear the area, called for additional backup, including from the Technical Assistance Response Unit and the Hostage Negotiation Team ("HNT"), and established a perimeter using armored vehicles as shields for the officers.  (Defs.' 56.1, ¶¶ 71, 78–83; Lisi Decl., 17–22.)  Additional ESU officers, including Defendants McLaughlin, Granahan, Molina, Schierenbeck, and Reed, responded to 15 Destiny Court and were told that Lt. Hayes had been shot in the apartment, likely by Tyree.  (Defs.' 56.1, ¶¶ 76–77.)[10]

The ESU officers positioned themselves around 15 Destiny Court, including inside of a house across the driveway from the residence and behind armored vehicles positioned near the entrance to the driveway.  (Defs.' 56.1, ¶¶ 81, 83.)  Sgt. Lisi directed "less than lethal" teams equipped with means of non-lethal force to be prepared to apprehend Tyree in case he surrendered himself without posing a serious threat to anyone.  (Defs.' 56.1, ¶ 84.)

---

[10] Defendants point out that at 6:19 a.m. that morning, Tyree posted "today I die" on his Facebook profile, and soon thereafter posted "they kicked in my door and it popped off."  (Defs.' 56.1, ¶¶ 72–73; Dkt. 134-14, Ex. N ("Facebook Post").)  However, the relevance of this evidence is unclear, given that there is no indication that Defendants were aware of these postings at the time of the shooting incident.

Soon after arriving on scene, the ESU officers gained access to the live video feed from inside Tyree's apartment.  (Defs.' 56.1, ¶ 85.)  Sergeant Lisi saw Tyree on the feed with an AK-47-style rifle and a bulletproof vest; he communicated that information to other ESU officers.  (Defs.' 56.1, ¶¶ 87–88; Lisi Decl., ¶ 25; Decl. of Detective Schierenbeck ("Shierenbeck Decl."), Ex. V, at ¶¶ 12–13; Decl. of Det. McLaughlin ("McLaughlin Decl."), Ex. S, at ¶¶ 15–16.)[11]  All Defendants periodically heard gunshots fired from within the apartment throughout the day.  (Defs.' 56.1, ¶ 89.)  Sgt. Lisi "regularly provided updates to [his] fellow ESU officers over the radio and by word of mouth as the situation unfolded."  (Lisi Decl., ¶ 27.)

HNT negotiators established contact with Tyree.[12]  (Defs.' 56.1, ¶ 90; Pl.'s 56.1, ¶ 150.)  NYPD officials also contacted Plaintiff, who was at home in Delaware, to arrange for her transport via helicopter to New York City.  (Pl.'s 56.1, ¶ 151; Pl.'s Aff., Dkt. 132, at ECF 22; Pl.'s Dep., at 96–99.)  Plaintiff arrived via helicopter at approximately 11:30 a.m.[13] and was immediately brought to an HNT trailer, where she was given a headset through which she could communicate with Tyree.  (Defs.' 56.1, ¶ 94–96; Pl.'s Aff., ¶ 84, at ECF 22; Pl.'s Dep., at 103:4–6.)  The HNT trailer did not afford Plaintiff a direct view of Tyree's apartment.  (Pl.'s Dep., 103:24–104:2.)  Plaintiff does not recall whether there was any video feed from Tyree's apartment into the HNT trailer.  (*Id.*

---

[11] Although Plaintiff could view the inside of Tyree's apartment via the video camera she had activated when he called her early in the day (Pl.'s 56.1, ¶¶ 79–80; Pl.'s Aff., Dkt. 132, at ECF 21, ¶¶ 69, 71; 50-h Hearing,, at ECF 27–28), it is unclear for how long Plaintiff watched the video feed, and she could not see her son via the video feed.  (50-h Testimony, at 28:4-8; Plaintiff's Dep. ("Pl.'s Dep."), Ex. L, Dkt. 134-12, at 85:16-86:3.)

[12] The record is unclear as to what form of contact was established between the HNT and Tyree.

[13] This was after Task Force officers had attempted to enter Tyree's apartment using a key and had commanded Tyree to come out because of fire concerns, which resulted in FDNY Lt. Hayes being shot by someone inside the apartment.

at 104:19–105:2.)  Shortly before noon, Tyree told Plaintiff he was going to come out of the basement apartment.  (Defs.' 56.1, ¶ 97; Pl.'s 56.1, ¶ 183; Pl.'s Aff., ¶ 84; Pl.'s Dep., at 105:19–20.)[14]  This information was communicated to all of the Defendants, who were taking cover behind armored vehicles located near the entrance to the driveway of Tyree's residence.  (Defs.' 56.1, ¶¶ 98–99.)

Soon after Defendants learned that Tyree was going to come out of the apartment, they heard numerous gunshots coming from inside the apartment and saw the apartment's windows shattering from gunfire.  (Defs.' 56.1, ¶ 102–03.)  Tyree emerged from the apartment firing an assault rifle at the window of the house next door, where other ESU officers were posted, forcing them to take cover from the gunfire.  (Defs.' 56.1, ¶ 104–106; Lisi Decl., ¶¶ 33–37; Colangelo Decl.,  ¶¶ 22–25; McLaughlin Decl.,  ¶¶ 20–24; Granahan Decl., Ex. T, Dkt. 134-20, ¶¶ 17–20; Molina Decl., Ex. U, Dkt. 134-21 ¶¶ 21–22; Schierenbeck Decl., Ex. V, Dkt. 134-22, ¶ 23; Reed Decl., Ex. W, Dkt. 134-23 ¶¶ 16–21.)  It appeared to Defendant Detective Robert Reed from his position behind an armored vehicle near the entrance to the apartment's driveway, that several bullets struck the house next door near the window, and that officers positioned near the window of the house pulled back to take cover.  (Defs.' 56.1, ¶¶ 107–08; Reed Decl., ¶¶ 14, 19–21.)  Tyree then turned toward the armored vehicles where Defendants were positioned and fired as he

---

[14] Plaintiff's recollection of her conversation with Tyree was as follows:

"I told him I loved him.  He told me he loved me.  I told him, "Darling, whatever you did," I said, "we would fight it.  We're going to fight it this time."  He said, "Ma, it's going to be a hell of a fight."  I said, "Okay."  I said, "I will get the loans." I said, "We will fight it."  "Okay," so I said, "I love you.  Are you coming out?" He said, "Yeah, ma, I'm coming out."  I said, "Okay[.]"

(Pl.'s 50-h, at 33:18–19, 21–22; Pl.'s Dep., at 105:14-21.)

11

ascended the stairs from the apartment. (*Id.* ¶ 109.) Defendant Detective Shawn McLaughlin heard bullets bouncing off the armored vehicle behind which he was taking cover, and Detective Reed heard a bullet whistle by his head. (Defs.' 56.1, ¶¶ 109–111; Lisi Decl., ¶¶ 38–40; Colangelo Decl., ¶¶ 26–27; McLaughlin Decl., ¶ 25–27; Granahan Decl., ¶¶ 21–24; Molina Decl., ¶¶ 21–23; Schierenbeck Decl., ¶¶ 23–24; Reed Decl., ¶¶ 22–24; Dkt. 134-31, Ex. FF.)

After Tyree started shooting in the direction of the armored vehicles, each Defendant fired between two and nine shots at Tyree, until it appeared that Tyree was no longer shooting. (Defs.' 56.1, ¶¶ 113–27.) Tyree fell out of Defendants' field of vision, into the stairwell of the basement apartment. (Defs.' 56.1, ¶ 128.) None of the Defendants know whether any of the shots they themselves fired struck Tyree. (Defs.' 56.1, ¶ 129.) The entire sequence of events—beginning with Tyree shooting out his apartment windows, then ascending his apartment stairs, and ending when Defendants stopped shooting—lasted only "several seconds." (Defs.' 56.1, ¶ 127.)

Several flash bang grenades were thrown into the stairwell, and a robotic camera was sent to the stairwell in order to observe Tyree; once it was deemed safe enough to approach, several ESU officers did so behind rolling ballistic shields. (Defs.' 56.1, ¶¶ 130–32.) Tyree was found mortally wounded or deceased, having been struck by four bullets in his head, torso, and right arm. (Defs.' 56.1, ¶¶ 133–35, 146–47.) Tyree's assault rifle was found near his body, and he was still wearing his bulletproof vest. (Defs.' 56.1, ¶¶ 136–37.) Nobody else was found in the apartment, and nobody else was seen leaving the apartment during the approximately six hours that police officers were on scene. (Defs.' 56.1, ¶¶ 139–40; 145.) There were bullet holes inside of Tyree's apartment. (Defs.' 56.1, ¶ 141; Dkt. 146, Ex. DD.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Summa v.*

*Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013) (quoting *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Facts are "material" if they "might affect the outcome of the suit under the governing law[.]"  *Anderson*, 477 U.S. at 248.  A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The moving party bears the burden of establishing the absence of any genuine issue of material fact."  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 322).  Once the moving party—here, Defendants—has met his initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 323–24 (internal quotation marks omitted).  In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation omitted).

In order to defeat summary judgment, non-moving parties "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Therefore, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  Summary judgment cannot be defeated "on the basis of conjecture or surmise."  *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (internal quotation and citation omitted).  Instead, a non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

The court's inquiry upon summary judgment is "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *see also id.* at 251–52 ("In essence, though, the inquiry . . . [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

## DISCUSSION

### I.      Plaintiff's 56.1 Statement

Defendants argue that Plaintiff failed to comply with the strict requirements of 56.1, because her 56.1 statement did not "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party" as required by Local Civ. R. 56.1(b). (Defs.' Reply Mem. of Law, "Defs.' Reply," Dkt. 142, at 4–6.) They also note that only seven of Plaintiff's 197 numbered paragraphs (Nos. 65–67, 69, 70, 82, and 111) "appear to be followed by a citation to evidence" as required by Local Civ. R. 56.1(d), and that, even then, the citations are vague, do not support the facts alleged, and are immaterial. (*Id.*; *see also* Pl.'s Counter-Statement, Dkt. 130.)

As the Second Circuit has advised, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted). Thus, "while a court is not required to consider what the parties fail to point out in their Local 56.1 statements, it may in its discretion

opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Id*. (internal quotation marks omitted); *cf. Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.").

Although Plaintiff has failed to comply with Local Rule 56.1(b) and only intermittently complied with 56.1(d), her 56.1 statement does provide her own factual account of the case, and the Court has before it a substantial record that includes deposition and 50-h hearing testimony from all parties, sworn declarations from Plaintiff and her friends and family members, photos of the scene, reports from the OCME, and ballistics reports.  (*See generally* Dkts. 132, 134.)  Given Plaintiff's *pro se* status, the Court will "examine the record to determine whether there are any triable issues of material fact, notwithstanding the fact that [Plaintiff] did not follow Local Civil Rule 56.1." *Cain v. Esthetique*, 182 F. Supp. 3d 54, 63 (S.D.N.Y. 2016); *see Thigpen v. Bd. of Trs. of Loc. 807 Labor-Mgmt. Pension Fund*, No. 18-CV-162 (PKC) (LB), 2019 WL 4756029, at *1 (E.D.N.Y. Sept. 29, 2019) (declining to deem defendant's 56.1 statement admitted when plaintiff "provide[d] her own factual account of the case and attached numerous, non-duplicative exhibits").  "To the extent [Plaintiff's] submission contains facts based on personal knowledge or otherwise admissible evidence, those facts will be considered in conjunction with the instant motion." *Genao v. Avon Salon & Spa*, No. 06-CV-3667 (RWS), 2008 WL 190605, at *1 n.1 (S.D.N.Y. Jan. 16, 2008).

## II.    Plaintiff's Excessive Force Claim

The Court construes Plaintiff as alleging a claim for excessive force under the Fourth and Fourteenth Amendments.

A.      Section 1983 and the Fourth and Fourteenth Amendments

Section 1983 creates a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 "deters governmental abuse and remedies unlawful governmental transgressions." *Edrei v. Maguire*, 892 F. 3d 525, 532 (2d Cir. 2018) (cleaned up). Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To state a claim under Section 1983, a plaintiff must allege that '(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.'" *Matthews v. City of New York*, 889 F. Supp. 2d. 418, 429 (E.D.N.Y. 2012) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)).

The Fourth Amendment protects individuals from unreasonable uses of force by law enforcement officers. "A police officer's use of force is excessive, in violation of the Fourth Amendment, 'if it is objectively unreasonable in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation.'" *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 242 (E.D.N.Y. 2014) (quoting *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir. 2004)). "[A]n officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (internal quotation marks and citation omitted). "[T]he objective

reasonableness inquiry, for purposes of either Fourth Amendment liability or qualified immunity, depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 36–37 (2d Cir. 2003). For the moving party to prevail at summary judgment, the record must show that "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995).

"Given the difficult problem posed by a suit alleging that an officer's excessive force caused a plaintiff's death—namely that the witness most likely to contradict the officer's story is unable to testify—the court may not simply accept what may be a self-serving account by the officer." *Garcia v. Dutchess Cnty.*, 43 F. Supp. 3d 281, 289 (S.D.N.Y. 2014) (cleaned up), *aff'd in part, dismissed in part on jurisdictional grounds*, 603 F. App'x 61 (2d Cir. 2015). "Rather, the court must also consider circumstantial evidence that, if believed, would tend to discredit the officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* (cleaned up).

Actions or statements by the shooting victim that "carr[y] the implication of imminent violence" can contribute to officers' assessment that a suspect poses a significant threat of death. *See, e.g., Chandie v. Whelan*, 21 F. Supp. 2d 170, 176 (E.D.N.Y. Sept. 3, 1998); *see also Hartman v. Snelders*, No. 04-CV-1784 (CLP), 2010 WL 11626508, at *7 (E.D.N.Y. Jan. 28, 2010) ("The jury must decide if defendants are credible in describing what they knew about the [victim of the shooting] on the date of the incident and whether a reasonable officer with that knowledge— accurate or not—acted reasonably in using the force that these defendants used."); *Est. of Priolo by Priolo v. City of New York*, No. 15-CV-6080 (AMD) (ST), 2019 WL 1428403, at *5–6

(E.D.N.Y. Mar. 29, 2019) (considering shooting officer's awareness of decedent's menacing of a security guard with a knife earlier on the night of the police shooting as relevant to the objective reasonableness of the officer's use of deadly force).

Further, "[t]he right not to be subject to excessive force, perhaps most commonly associated with the Fourth and Eighth Amendments, can also arise under the Fourteenth." *Edrei*, 892 F.3d at 533 (citing *Graham*, 490 U.S. at 394, and *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998)).  "This is because the touchstone of due process, which is protection of the individual against arbitrary action of government, bars the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* (internal citations omitted). In *Kingsley v. Hendrickson*, the Supreme Court delineated six non-exhaustive "[c]onsiderations" courts should use when assessing Fourteenth Amendment excessive force cases:

> The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

576 U.S. 389, 397 (2015); *see also Edrei*, 892 F.3d at 537–38.  An officer's conduct is objectively unreasonable under the Fourteenth Amendment "when [it] is intended to injure in some way unjustifiable by any government interest." *Edrei*, 892 F.3d at 533.  "The Fourteenth Amendment applies only to excessive force claims that do not involve an arrest, investigatory stop, or other seizure of a free citizen." *Rodriguez v. City of New York*, 594 F. Supp. 3d 534, 545 (E.D.N.Y. 2022) (citation omitted).

**B.    Plaintiff Has Failed to Show a Genuine Dispute About the Reasonableness of Defendants' Use of Force**

The evidence put forth by Defendants establishes that their lethal use of force against Tyree on August 14, 2015, though tragic, was not excessive.  This evidence establishes that it was

objectively reasonable for Defendants to believe that on August 14, 2015, Tyree was armed and dangerous, and that Defendants and the other officers on the scene were in mortal danger when Tyree emerged from his apartment firing an assault rifle. Under these circumstances, no jury could find that Defendants' use of lethal force against Tyree—notwithstanding the tragic result—was excessive.

First, Defendants had numerous reasons to believe that prior to emerging from his apartment on August 14, 2015, Tyree was armed and potentially violent. Sgt. Lisi had observed Tyree, via live video feed, inside his apartment with an AK-47-style rifle and a bulletproof vest—information that he communicated to the ESU team positioned in a building near the apartment and behind armored vehicles. (Defs.' 56.1, ¶¶ 85, 87–88; Lisi Decl., ¶¶ 37, 40). FDNY Lt. Hayes was shot by someone inside the apartment, presumed to be Tyree,[15] when Lt. Hayes attempted to enter the apartment to rescue Tyree from the smoke-filled apartment. (Defs.' 56.1, ¶¶ 58–64, 70; Defs.' Reply to Pl.'s 56.1 Statement, Dkt. 141, ¶¶ 142.) Thereafter, gunfire was periodically heard coming from inside the apartment during the hours-long standoff. (Defs.' 56.1, ¶ 89).

Second, Defendants had ample reason to believe that they were at risk of serious, if not deadly, harm as Tyree emerged from the apartment. As established by the undisputed evidence in the record, almost immediately after telling Plaintiff that he was going to come out of the apartment, Tyree began shooting out the windows of his apartment. (Defs.' 56.1, ¶¶ 102–03.) He then began to emerge from the basement apartment while shooting his assault rifle at ESU officers posted in the house next door, causing those officers to take cover. (Defs.' 56.1, ¶¶ 104–06.) Although Defendants would have been justified in using lethal force to protect the ESU officers at

---

[15] The evidence establishes that Tyree was the only person seen inside the apartment via the video feed on the day of the shooting and was the only person who sought to exit the apartment that day.

that moment, they waited to fire on Tyree until he subsequently turned toward Defendants, who were taking cover behind bulletproof vehicles at the end of the driveway, and strafed those vehicles with bullets.  (Defs.' 56.1, ¶¶ 109–11.)  One bullet passed so close to Defendant Detective Reed that he heard the "whistling sound" that it made.  (Reed Decl., ¶ 23.)

Under all of these circumstances, Defendants clearly were justified in using deadly force against Tyree.  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985) (holding that deadly force may not be used unless the officer who uses it "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."); *Diggs v. New York Police Dept.*, No. 04-CV-1849 (CBA) (LB), 2005 WL 3533158, at *4 (E.D.N.Y. Dec. 22, 2005) ("If a suspect threatens an officer with a weapon, the officer may use deadly force in response.").  Indeed, even if Defendants had not been aware of the events that had transpired before Tyree began firing at them, their use of lethal force would still have been reasonable.[16]

Notably, the physical evidence in the record corroborates Defendants' sworn accounts of what occurred on the day of the shooting.  This evidence includes photographs of Tyree's bullet-ridden apartment, shell casings and numerous firearms recovered from the scene both inside and outside the apartment, and ballistics reports linking those shell casings to the assault rifle Plaintiff was seen carrying on video for hours during the standoff.  (*See* Defs. 56.1, citing Exhibits DD, II.)

In the face of this substantial evidence supporting the lawfulness of Defendants' actions, Plaintiff has failed to demonstrate a genuine dispute of material fact.  Plaintiff posits the existence of numerous disputes with Defendants' account of the shooting.  She alleges that Defendants, not

---

[16] Although Plaintiff suggested at the 50-h Hearing that Defendants had a duty to order Tyree to drop his weapon before firing (*see* 50-h Hearing, at 44), that requirement only applies when such a warning is feasible, *see Tennessee v. Garner*, 471 U.S. at 12–13 (requiring "where feasible, some warning" before using deadly force), which was not the case here.

Tyree, fired their weapons while Lt. Hayes was inside the apartment, and that Defendants, not Tyree, periodically fired their assault rifles at Tyree's apartment thereafter in the hours before he emerged.  (Pl.'s 56.1, ¶¶ 142, 170, 184.)  She alleges that her son told her that he was going to peacefully surrender just before he emerged from the apartment.  (Pl.'s 56.1, ¶ 183; Pl.'s Dep., at 106:19-22.)[17]  She asserts that there is a "genuine dispute" as to whether Tyree fired his assault rifle as he emerged from the apartment.  (Pl.'s 56.1, ¶¶ 177, 178, 180, 181.)  She argues that because "no fingerprints nor DNA" were found on the flash grenade, rifle, or shell casings found in the apartment, and the OCME Medical Examiner "cannot determine the sequence of shots" that struck and killed Tyree, a material dispute exists as to whether Defendants used excessive force. (Pl.'s 56.1, ¶¶ 120, 190, 192, 193.)  Finally, she contends that, to her knowledge, her son did not have any guns, and that the Crime Scene Unit lied about recovering numerous guns from her son's apartment.  (50-h Hearing, at 65:9-12.)

Plaintiff, however, does not identify or proffer any evidence to support these allegations and assertions, so as to create a genuine factual dispute.  *See D'Amico*, 132 F.3d at 149 (non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful").  Even assuming Plaintiff's account of her conversation with Tyree about his intent to surrender peacefully would be admissible at trial, Plaintiff has not offered any evidence as to what actually happened when Tyree exited the apartment or any evidence contradicting Defendants' consistent accounts of the events that led to Tyree being shot and killed by the officers, which is corroborated by physical evidence.

---

[17] However, at the 50-h Hearing, Plaintiff's account of her conversation with Tyree before he emerged from the apartment did not include any indication that he would peacefully surrender. (50-h Hearing, at 32–33.)

Critically, Plaintiff offers no evidentiary basis for her claim that Tyree did not shoot his assault rifle as he emerged from the basement apartment.  Plaintiff did not see Tyree emerge from the basement apartment, nor any other part of the confrontation that resulted in law enforcement using deadly force against her son.  (Pl.'s Aff., ¶¶ 85–86, at ECF 22; Pl.'s Dep., at 107:12–24, 161; 50-h Hearing, at 47:10-13 (Q: "Were there any witnesses to the incident or to the scene or what was taking place?" A: "No, they had it blocked off.").)  In fact, Plaintiff explicitly states that she did not know when she emerged from the HNT trailer what had happened in the moments immediately preceding her son's death, as evidenced by the fact that she asked a police officer on scene whether her son fired at police officers.  (50-h Hearing, at 43:13-17 ("I asked them did my son fire at them, I was told no—I was told there was two small caliber guns by his body. I told the guy, 'that's not what I asked you. I asked you, did he fire on you.'"); Pl.'s 56.1, ¶ 100 ("Plaintiffs [sic] ask the nearest officer did they just kill [Tyree] or he shot at officer, the officers said no he ran back inside the apt at that moment he received communication and allege that 2 hand [guns] was found by [Tyree's] body.").)

Plaintiff, in failing to identify any evidence that might counter the eyewitness testimony of all seven Defendants and numerous other officers at the scene, as well as the corroborating physical evidence, has not shown that there is a "genuine dispute" as to any material fact relating to her excessive force claim.  In particular, Plaintiff has failed to demonstrate a genuine dispute about whether Defendants fired at Tyree only after he shot at them and other officers as he emerged from his apartment on August 14, 2015.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").[18]

Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's Fourth Amendment excessive force claim as to Defendants.

Additionally, insofar as Plaintiff alleges a Fourteenth Amendment excessive force violation, that claim also fails. Defendants were attempting to arrest Tyree when they shot and killed him. Plaintiff's excessive force claim is therefore only properly assessed under the Fourth Amendment standard. *See Graham*, 490 U.S. at 395 (the Fourteenth Amendment exclusively applies to excessive force claims that do not involve "an arrest, investigatory stop, or other 'seizure' of a free citizen").

---

[18] Similarly, Plaintiff's contention that there are "genuine dispute[s]" (Pl.'s 56.1, ¶ 188) as to whether the NYPD recovered numerous firearms, shell casings, and a smoke grenade in Tyree's apartment must fail because it is based on pure conjecture, without any supporting evidence, and is, in fact, contradicted by the record, including crime scene vouchers. (Dkt. 140-3, Ex. II.) Relatedly, the lack of fingerprint or DNA evidence does not create a genuine dispute of fact, given that the OCME merely found that there were no fingerprints "suitable for capture/identification" on the flash grenade and assault rifle, and the shell casings were found to have been from Tyree's assault rifle. (Defs.' Reply to Pl.'s 56.1 Statement, ¶¶ 189 n.3, 190, 192; Dkts. 141, 140, Exs. GG, HH.) The OCME's inability to collect such forensic evidence, which is not uncommon, is insufficient to create a genuine dispute of fact as to whether these items were recovered from the scene. Nor do they create a genuine dispute as to whether the rifle and shell casings were possessed and used by Tyree during the events of August 14, 2015, as reported by Defendants and the other officers at the scene.

## III.    Plaintiff's Other Constitutional and Statutory Claims

Plaintiff also alleges violations of "[t]he Fourth,[19] Fifth, Sixth, [and] Eight[h]"

Amendments, and 18 U.S.C. § 1519.[20]  Defendants move for summary judgment as to all of these

claims.  (Defs.' Mot., Dkt. 136, at 20–23.)[21]

### A.    Plaintiff's Fourth Amendment Search Claim

Plaintiff makes two allegations that could relate to a claim that Defendants unreasonably

searched Tyree's apartment in violation of the Fourth Amendment: that Defendants unlawfully

forced their way into his apartment when they first arrived on the scene, and that they did so again

---

[19] The Court liberally construes Plaintiff as making a Fourth Amendment search claim separate from and in addition to her Fourth Amendment excessive force claim.

[20] Plaintiff alleges violations of "The Fourth, Fifth, Sixth, Eight[h] and Fourteenth Amendment[s]; Restricts the Government from Authorizing unreasonable search and seizures [sic]. Cruel and unusual punishment. Excessive and Deadly Forces. Deprive any person of Life, Liberty, or property without due process of law and 18 U.S.C. 1519 Destruction, alteration or falsification of Government Evidence."  (Dkt. 58-1, at ECF 5, 7.)  The Court dismissed Plaintiff's Fourteenth Amendment claim *supra* Section II.B, and therefore addresses the other four constitutional claims and the federal statutory claim here.

[21] As previously noted, the Court erroneously stated at the December 13, 2021 status conference, that the only claim remaining in the case was "the alleged use of excessive force by the police officers who executed the warrant and killed Mr. Tyree."  (12/13/2021 Minute Entry.)  However, Plaintiff was clearly on notice of her obligation to defend against summary judgment as to all of her allegations, since Defendants' summary judgment motion addressed those claims.  (Defs.' Mot., Dkt. 136, at 20–23.)  Further, Plaintiff had ample opportunity to factually develop all of her claims, as discovery in this case closed on August 14, 2020—over a year before the December 13, 2021, status conference and nearly two years before Plaintiff submitted her opposition to Defendants' motion on April 7, 2022.  (Dkts. 72, 130.)  Plaintiff also does not appear to have limited her opposition to the excessive force claim, but included in her 56.1 Counter-Statement numerous factual allegations unrelated to that claim, including facts related to discovery and New York Freedom of Information Law disputes and facts that appear more relevant to the Fourth Amendment unlawful search allegation.  (*See, e.g.,* Pl.'s 56.1, ¶¶ 51–55, 81.)  The Court therefore assesses Defendants' motion as to these additional constitutional claims "in the light most favorable" to the non-moving Plaintiff, and "mindful that a *pro se* party's pleadings must be liberally construed."  *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 548 (E.D.N.Y. 2015) (first quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); and then quoting *Hughes v. Rowe*, 449 U.S. 5, 9 (1980)).

when they searched the apartment after Tyree was shot.  The Court grants summary judgment for Defendants as to both claims.

First, Plaintiff alleges that "NYPD, U.S. Marshal and FDNY kick[ed] in [Tyree's] apartment door" at "[a]bout 5:45 am" on the day of the incident.  (SAC, Dkt. 58-1, at ECF 6.)  In her 56.1 Counter-Statement, Plaintiff also contends that the Task Force officers "forcefully entered" Tyree's apartment.  (Pl.'s 56.1, ¶ 81; *see also* ¶ 136 ("There is a genuine dispute[] to whether or not [Task Force] forcefully enter 15 Destiny CT and detonate[d] a smoke/stun grenade[]").)  Second, Plaintiff alleges that at "[a]bout 13:37 OCME MI, NYPD Forensic investigators and Bomb Squad began to process and search the deceased, scene, etc. . . . Photograph[s] taken of the deceased, scene were upload/send on social media, unauthorize[d] and unknown individual."  (SAC, Dkt. 58-1, at ECF 9.)

Neither of these assertions creates a genuine dispute of fact as to the existence of an unreasonable search.  First, Plaintiff fails to substantiate her allegations that Defendants unreasonably forced their way into Tyree's apartment or otherwise conducted an unconstitutional search.  In fact, she testified that she had no direct knowledge of Defendants' actions with respect to the two alleged intrusions: she said in her deposition that she could not see in real time or via video recording when officers tried to enter [Tyree's] home on the morning of August 14, 2015 prior to the shooting (Pl.'s Dep., at 125:6–13), and that she did not return to the apartment or see it after Tyree was shot until approximately one week later.  (*Id.*, at 117:216–117:18.)  Plaintiff does not offer any additional evidence relating to her unreasonable search claim.

Second, the factual record shows that none of the Defendants were themselves involved in the initial alleged intrusion into Tyree's apartment.  (Defs.' 56.1, ¶¶ 28, 30, 35–49.)  The Defendants arrived after FDNY Lt. Hayes was shot—which occurred after the Task Force officers

unlocked the door to the apartment using a key given to them by the occupant of the upper floors of the house—and did not attempt to breach the door.  (*Id.*, ¶¶ 37–38, 66–67, 76.)   Plaintiff's allegation regarding the second alleged intrusion names the investigators from the OCME and the NYPD's forensic investigators and Bomb Squad rather than Defendants, and the Defendants offer sworn testimony that not all of them entered the apartment after the shooting, while those who did did not search for evidence while inside.  (*Id.*, ¶¶ 142–44.)  "It is well settled that, in order to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013); *Belton v. Wydra*, No. 17-CV-02006 (KAD), 2021 WL 1056770, at *5 (D. Conn. Mar. 18, 2021) (granting summary judgment in favor of police officer defendant on an unreasonable search claim because he was not personally involved in the search).

Further, although Plaintiff does not name Defendants with respect to the second alleged intrusion, any claim that they violated Tyree's Fourth Amendment rights by entering his apartment after Defendants and Tyree engaged in a firefight is unfounded.  "It is well-settled . . . that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay."  *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990).   "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action."  *Id.* (internal quotation marks and citation omitted).  Here, the three Defendants who did enter the apartment after the shootout did so in order to ensure that Tyree did not pose a further threat, and to see if there was anyone else inside the apartment.  (Defs.' 56.1, ¶¶ 138–39.)

When they approached the apartment, they were still unsure of whether Tyree had been shot.  (*Id.* ¶ 129.)

Finally, even in the absence of exigency, Defendants' entry into Tyree's apartment after the shooting was presumptively reasonable by virtue of the arrest warrant issued by the Honorable Raymond J. Dearie for Tyree's arrest.  (Defs.' 56.1, ¶ 16); *Walczyk v. Rio,* 496 F.3d 139, 155–56 (2d Cir. 2007) ("Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause.").  An "officer armed only with an arrest warrant [is allowed] to enter a suspect's home, or what he has reason to believe is his home, in order to execute that warrant where a reasonable belief exists that the suspect is present."  *Mandola v. Cnty. of Nassau,* 222 F. Supp. 3d 203, 217 (E.D.N.Y. 2016) (citing *United States v. Lauter,* 57 F.3d 212, 214 (2d Cir. 1995)).  Further, "based on [the Court's] review of the Probation Department files in Garland Tyree's underlying criminal cases, it [finds] no evidence of an improper motive for the attempt to arrest Mr. Tyree on August 14, 2015, which ultimately led to his death[.]"  (12/13/2021 Minute Entry.)  The warrant for Tyree's arrest was valid, and therefore Plaintiff fails to create any genuine dispute of fact as to the reasonableness of the entry into and search of Tyree's apartment by Defendants and/or other officers.

For the reasons stated above, Defendants are entitled to summary judgment as to Plaintiff's claim that Tyree was subject to an unconstitutional search in violation of the Fourth Amendment.

### B.    Fifth and Sixth Amendments

The Fifth Amendment protects criminal defendants' rights to a grand jury, and against double jeopardy, self-incrimination, deprivation "of life, liberty, or property without due process of law," and the taking of private property for public use "without just compensation."  U.S.

CONST. amend. V.   Because "[t]he Fifth Amendment 'governs the conduct of the *federal* government and *federal* employees, and does not regulate the activities of state officials or state actors,'" it does not apply to the facts of this case, where Defendants are NYPD officers.  *Cassidy v. Scoppetta*, 365 F. Supp. 2d 283, 286 (E.D.N.Y. 2005) (quoting *Dawkins v. City of Utica*, No. 93-CV-373, 1997 WL 176328, at *4 (N.D.N.Y. Apr. 4, 1997)).[22]

"The Sixth Amendment . . . is designed to prevent unfair trials" by guaranteeing such rights as a speedy trial, impartial jury, confrontation of witnesses, and counsel.  *Porter v. United States*, No. 08-CV-1497 (CPS), 2008 WL 5451011, at *2 n.2 (E.D.N.Y. Dec. 31, 2008) (quoting *Michigan v. Harvey*, 494 U.S. 344, 369 (1990)).  Tyree was not detained and did not face the prospect of trial, and Plaintiff did not develop facts that any Defendants violated Tyree's rights under any provision of the Sixth Amendment.  Therefore, no Sixth Amendment violation could have occurred in this case, and Defendants are entitled to summary judgment as to Plaintiff's Sixth Amendment claim.

## C.     Eighth Amendment

The Eighth Amendment prohibition on cruel and unusual punishment does not apply to those who "have not been convicted of a crime and thus 'may not be punished in any manner— neither cruelly and unusually nor otherwise."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)

---

[22] Although Fifth Amendment due process claims may be brought against state officials under the Fourteenth Amendment, Plaintiff does not allege any due process violations other than the Fourteenth Amendment excessive force claim dismissed *infra* at Discussion Section II.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law." (internal quotation marks and citation omitted)); *Mitchell v. Home*, 377 F. Supp. 2d 361, 372–73 (S.D.N.Y. 2005) ("The Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials.  Any due process rights plaintiff enjoys as against state government officials . . . arise solely from the Fourteenth Amendment due process clause." (internal citation omitted)).

(quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Since Tyree had not even been arrested at the time he was killed by Defendants, the Eighth Amendment does not apply to the facts of this case. *Barlow v. Male Geneva Police Officer Who Arrested Me On Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (summary order) (upholding district court's finding that the Eighth Amendment did not apply to plaintiff's claim of excessive force arising from his arrest).

    **D.**    **Section 1519**

Plaintiff claims that Defendants violated 18 U.S.C. § 1519, a federal criminal statute that prohibits the obstruction of justice.  As Defendants note, this allegation cannot be brought by Plaintiff, because "federal criminal statutes do not provide private causes of action."  *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).  Summary judgment is therefore granted in favor of Defendants as to this claim.

## IV.    Plaintiff's Municipal Liability Claim

To the extent Plaintiff is alleging a municipal liability claim against the City, it too fails both because none of her claims against the individual Defendants can survive summary judgment and because she has not offered any evidence to establish the City's liability.  First, as discussed above, because all of Plaintiff's claims against the individual Defendants are being dismissed, the City cannot be liable for the alleged excessive force.  *See Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013) (holding that where a plaintiff sues both municipal actors and a municipality under Section 1983 for the same alleged violation of constitutional rights, "the plaintiff's failure to secure a judgment against the individual actors would, indeed, preclude a judgment against the municipality *if* the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged tort." (emphasis in original)).  Second, in order to establish

29

municipal liability under Section 1983, Plaintiff would have to show that Tyree's constitutional rights were violated due to a municipal policy or custom, *Saeli v. Chautauqua Cnty., N.Y.*, 36 F.4th 445, 460 (2d Cir. 2022), and Plaintiff has failed to offer any such evidence as to any of the alleged constitutional violations.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion for summary judgment and dismisses this action with prejudice.   The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 28, 2023
Brooklyn, New York